IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OMNIWIND ENERGY SYSTEMS, INC., | : | CIVIL ACTION |
| LOREN A. SCHULTZ, and | : | |
| ANDREW CLAUSS | : | |
| | : | |
| v. | : | |
| | : | |
| RODERICK O. REDO | : | |
| and | : | |
| REDO INDUSTRIES, INC. | : | NO. 14-5976 |

MEMORANDUM

Dalzell, J.                                                   February 24, 2015

## I.    INTRODUCTION

We consider here plaintiffs' motion for entry of default judgment against both

defendants, who have failed to appear, plead, or otherwise defend in this case. Plaintiffs are

OmniWind Energy Systems, Inc. ("OmniWind"), Loren A. Schultz ("Schultz"), and Andrew D.

Clauss ("Clauss"). Defendants are Roderick O. Redo ("Redo") and Redo Industries, Inc. ("Redo

Industries").

We have jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and 1367 as this suit is between

citizens of different states and the amount in controversy exceeds $75,000.[1]

---

[1] OmniWind, Schultz, and Clauss are Pennsylvania citizens. Compl. at ¶ 1. Redo and
Redo Industries are Kansas citizens. Id. at ¶ 2. The amount in controversy exceeds $75,000, as
OmniWind alleges defendants owe it in excess of $100,000. While Clauss and Schultz's claims
are each for less than the jurisdictional amount, all claims in the complaint arise from the same
common nucleus of operative fact, and we take supplemental jurisdiction over them pursuant to
§ 1367. See, e.g., Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 549 (2005).
        Plaintiffs claim jurisdiction is also proper under 28 U.S.C. §1331 because "the case
involves federal questions arising under 18 U.S.C. § 1343." Compl. at ¶ 4. We do not have
original jurisdiction in this matter pursuant to § 1331 as the complaint presents no federal

While we are satisfied that we have jurisdiction over plaintiffs' claims and the absent defendants, we will deny plaintiffs' motion for entry of default judgment and dismiss their complaint without prejudice.

The entry of default judgment is a matter for the Court's discretion. The absent defendants' possible defenses to five of plaintiffs' seven claims weigh against the entry of default judgment. For reasons of judicial economy and in the interests of justice, these seven claims -- all of which share a common nucleus of operative fact --  should be adjudicated together. Keeping the claims together also insulates plaintiffs from claim-splitting challenges.[2]

## II.     STANDARDS FOR DEFAULT JUDGMENT

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Once the clerk enters default, if the claim is not for a sum certain as contemplated by Fed. R. Civ. P. 55(b)(1), then "the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2); see also, e.g., Eastern Elec. Corp. of N. J. v. Shoemaker Constr. Co., 657 F. Supp. 2d 545, 552 (E.D. Pa. 2009).

Whether to grant a default judgment "is left primarily to the discretion of the district court." United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 194 (3d Cir. 1984); Hritz v. Woma Corp., 732 F.2d 1178, 1180 (3d Cir. 1984). A party "is not entitled to a default judgment as of right." Eastern Elec. Corp., 657 F. Supp. 2d at 551.  Courts disfavor default judgment

---

question, notwithstanding plaintiffs' citation to 18 U.S.C. § 1343, a criminal wire fraud statute. We sit only in diversity in this controversy.

[2] See, e.g., Schneider v. United States, 301 F. App'x 187, 189-90 (3d Cir. 2008) (explaining plaintiff's missteps when he attempted to simultaneously amend, refile, and newly file complaints against the same defendants for claims arising out of substantively the same conduct).

because it precludes deciding the case on its merits.  Id. "Matters involving large sums should not be determined by default judgments if it can reasonably be avoided." Tozer v. Charles A. Krass Milling Co., 189 F.2d 242, 245 (3d Cir. 1951). Default judgment is appropriate if a defendant entirely fails to appear or otherwise defend. See, e.g., Fed. R. Civ. P. 55(b)(2); Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 177 n. 9 (3d Cir. 1990).

"A consequence of the entry of a default judgment is that the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990) (quoting 10 Wright & Miller, Federal Practice and Procedure, § 2688 at 444 (2d ed. 1983)) (internal quotations omitted). Once the clerk enters default, the defaulting defendant is deemed to have admitted to every well-pled allegation in the complaint. Breaking the Chain Found. v. Capitol Educ. Support, Inc., 589 F. Supp. 2d 25, 28 (D.D.C. 2008). Before granting default judgment, a court must ascertain whether the unchallenged facts constitute a legitimate cause of action, since a defaulting party does not admit to mere conclusions of law. Chanel, Inc. v. Gordashevsky, 558 F. Supp. 2d 532, 536 (D.N.J. 2009); see also Labarbera v. ASTC Labs. Inc., 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010).

Our Court of Appeals requires us to consider three factors before entering a default judgment.  They are whether (1) plaintiff will be prejudiced if we deny default, (2) the defendant has a meritorious defense, and (3) the default was the product of defendant's culpable conduct. Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000) (hereinafter "the Chamberlain factors").

We recite the facts as they appear in the complaint.

### III.    FACTUAL BACKGROUND

OmniWind is a Pennsylvania limited liability company with a principal place of business in Bucks County, Pennsylvania. Compl. at ¶ 1.  OmniWind manufactures and distributes wind turbines and provides electricity to customers through private power purchase agreements. Id. at ¶ 6. Schultz, a member and chair of OmniWind's Board of Managers, resides in Dublin, Pennsylvania. Id. at ¶¶ 1,7.  Clauss, a member and former OmniWind employee, resides in Doylestown, Pennsylvania. Id. at ¶¶ 1,8.

OmniWind holds licenses to patented airfoil technology that enables the efficient generation of energy from wind. Id. at ¶ 13. In the summer of 2012, after years of making itself more attractive to private and institutional investors, OmniWind sought outside investors  to fund a major power purchase agreement. Id. at ¶¶ 14-15.

Enter Redo Industries, a Kansas corporation located in Wichita, and its sole shareholder, director, and officer, Redo himself, also of Wichita, Kansas. Id. at ¶¶ 2, 9. Upon plaintiffs' information and belief, Redo uses Redo Industries "for investment purposes and may use it to trade commodities, including oil, natural gas and food commodities." Id. at ¶ 11.

On October 13, 2012, Redo and OmniWind entered into a Binding Summary of Proposed Terms, attached to the complaint as Exhibit A. Id. at ¶ 16. The Binding Summary provided that Redo Industries would invest $15 million in OmniWind and provide it with $10 million in debt financing in exchange for 50% of its equity and certain managerial rights. Id. at ¶¶ 17-18. Redo, on behalf of Redo Industries, executed a Subscription Agreement, a General Terms Sheet with Risks or "Disclosure", and a First Amended and Restated Operating Agreement on October 17, 2012. Id. at ¶ 19. Plaintiffs attach these documents -- the Subscription, Disclosure, and Operating Agreement -- as Exhibits B, C, and D. Plaintiffs aver that the Binding Summary, Subscription,

4

Disclosure, and Operating Agreement together constitute Redo Industries' "contractual and legal obligation to provide OmniWind with financing for its obligations." Id. at ¶ 20.

On October 15, 2012, Redo contacted Karl Douglass, OmniWind's Chief Executive Officer, to discuss closing details. Id. at ¶ 21. Redo allegedly told Douglass that Redo Industries needed about $55,000 for an escrow account to use as collateral for money to be paid as "discount points and loan fees for monies [Redo Industries] and/or Redo were borrowing." Id. at ¶ 22. Redo told Douglass that "OmniWind needed to have some collateral at risk in the form of 'skin in the game' in order for [Redo Industries] and OmniWind to be business partners." Id. Redo said the escrowed funds would be returned to OmniWind at closing and would be credited to the amount Redo Industries would invest in OmniWind, and that closing would occur within a week or two of receipt of the money in escrow. Id. at 23. When Redo requested the funds "OmniWind had no income and no cash reserves." Id. at ¶ 24. However, as the deal with Redo was "in OmniWind's management team's belief, a fair one, and could provide it with the necessary funding in order to execute its business strategy, OmniWind's management made the decision" to send the money. Id. OmniWind wired $55,000 to defendants' private bank, Sterling Asset Management, Inc., in Las Vegas, Nevada. Id. at ¶ 25.

On October 29, 2012, Douglass spoke with Redo, who assured Douglass that he would be able to close on or before November 26, 2012. Id. at ¶ 26. OmniWind, relying on Redo's statements, assured some of its creditors that it would be able to begin paying its obligations by the end of 2012. Id. at ¶ 27. OmniWind, again relying on Redo's statements, continued to incur other business obligations -- insurance, payroll, rent, etc. -- so that it could perform on its contracts as soon as the investment money arrived. Id. at ¶ 28.

Weeks went by without a closing. Id. at ¶ 29. Redo assured OmniWind , in a letter attached as Exhibit E, that they would close by December 21, 2012.  Id.  Redo told Douglass that the closing had to happen before December 21, as the underwriters of Redo Industries' financing were going away for the holidays and would not return until 2013. Id. at ¶ 30. Closing did not occur by December 21st. Id. at ¶ 31.

Redo assured OmniWind that closing was still imminent but that he needed to work out a few items with his banker and they would close in January of 2013. Id. at ¶ 32. Redo explained that he could not close sooner because the underwriter for the loan transaction who would be used to fund his investment in OmniWind was still on vacation. Id. at ¶ 34. Redo also said Redo Industries needed another $75,000 to close on its financing. Id. at ¶ 33. In reliance on these statements, OmniWind transferred $75,000 via three electronic transfers: $15,000 on January 22, 2013; $10,000 on January 23, 2013; and another $50,000 on January 23, 2013. Id. at ¶ 35. "All monies were transferred to accounts at Redo's instruction, either on his behalf, or on behalf of" Redo Industries. Id.  In order to supply OmniWind with the money, Douglass took out a personal loan from a private lender, and OmniWind borrowed money from a second private lender. Id.  at ¶ 36. Redo assured Douglass that they would close by the end of January of 2013. Id. at ¶ 37. That did not happen. Id. at ¶ 38.

Redo memorialized receiving a portion of the $130,000 OmniWind sent him by signing a Note, attached by plaintiffs as Exhibit F. Id. at ¶ 39. Plaintiffs allege that the Note does not fully memorialize all the money OmniWind loaned Redo and Redo Industries, as Redo immediately requested more money after receiving the $100,000 and signing the Note. Id. at ¶ 40. Douglass sent Redo a second Note -- with the same terms as the first Note -- to memorialize the additional loan. Id. at ¶¶ 41-42. Redo acknowledged receiving the second Note, but neither executed nor

returned it. Id. Douglass asked Redo to provide him with a letter for OmniWind's creditors indicating that closing would occur on a date certain on or before January 25, 2013. Id. at ¶ 43. Redo sent such a letter on January 10, 2013, attached by plaintiffs as Exhibit G. Id.

"During the entire spring of 2013, Redo continued to represent that he was close to completing the deal that would free up the necessary funds so that he could honor his and [Redo Industries'] commitments." Id. at ¶ 44. On April 29, 2013, Redo allegedly presented a document that he characterized as proof of funds. Id. at ¶ 45. The document purported to be a bank guaranty of five billion euros from "ABN-AMRO bank to an unknown beneficiary of Southeast Holdings Corporation." Id. (document attached as Exhibit H).

After brief research, OmniWind's management team determined that the document was fraudulent and the subject of a worldwide financial scam. Id. at ¶ 46. Douglass confronted Redo with this information, and Redo confessed "that he had been let down by his personal advisors and that his transaction agreement, whereby he was to obtain monies to invest into OmniWind, had been terminated. Redo also confessed that all of the money OmniWind had transferred…had been lost" when the underlying investment transaction collapsed. Id. at ¶¶ 47-48.

In that same conversation, Redo told Douglass "that he had the ability to start over, and that he would be able to have money to OmniWind in the summer of 2013." Id. at ¶ 49. On May 15, 2013, Redo "presented a document he characterized as proof of a deal that was going to make funds available" to fulfill his and/or Redo Industries' commitments. Id. at ¶ 50. Plaintiffs attach that document as Exhibit I. OmniWind, "faced with financial issues due to its obligations to creditors, and understanding that Redo's investment was going to take additional time," began to seek other investors in the spring of 2013 while still maintaining communications with Redo. Id. at ¶ 51.

OmniWind's finances had deteriorated significantly since the fall of 2012, when Redo initially agreed to invest in OmniWind through Redo Industries. Id. at ¶ 52. On July 9, 2013, Redo approached Douglass to inform him that he would be able to transfer money to OmniWind that month. Id. at ¶ 54. "OmniWind had few options, and Redo informed Douglass that he had his deal 'done', but only needed an additional $25,000.00 to go to closing." Id. at ¶ 54. "After much discussion among Schultz, Clauss and Douglass, Schultz and Clauss agreed to lend [Redo Industries] and Redo $17,000 and $8,000, respectively, for a period of one week." Id. at ¶ 55. Those loans were memorialized in Notes, attached to the complaint as Exhibits J and K.

Redo did not close on his deals -- either to obtain funding or with OmniWind in July of 2013. Id. at ¶¶ 56-57.  In late summer of 2013, Redo once again began to assure Douglass that he would close on his financing and complete his investment commitments to OmniWind. Id. at ¶ 58.

In early September of 2013 Douglass informed Redo that one of OmniWind's creditors, Precision Assembly, Inc., had obtained a judgment against OmniWind and was serving interrogatories in aid of execution against them. Id. at ¶ 59. "Redo informed Douglass that it wasn't going to matter, because there would be plenty of money to pay creditors, and 'we' would use a different vendor to obtain the same goods and services in the future." Id.

Redo continued to represent that he could be the lead investor. Id. at ¶ 60. During December of 2013 and into 2014, OmniWind pursued additional capital from multiple investment sources, many of which declined to invest due to OmniWind's deteriorated and uncertain financial condition. Id. at ¶ 61.

"As 2013 began to draw to a close, OmniWind's management believed it was captive to Redo and [Redo Industries], as [they] owed OmniWind and its members and managers

significant monies. OmniWind's financial condition made it unattractive for further investment and it had no other serious suitors." Id. at ¶ 62. Even as OmniWind engaged in preliminary discussions with new potential investors and pursued potential joint ventures, OmniWind's management "continued to engage in conversations with Redo, who continued to reassure OmniWind that he would be able to obtain funds to live up to his obligations" memorialized in the Binding Summary. Id. at ¶ 63.

In December of 2013, Redo "described multiple pathways for his ability to finance OmniWind, and possibly provide interim cash." Id. at ¶ 64.

First, Redo would leverage money he had on hand to purchase a large shipment of crude oil which he would use as collateral to obtain a loan from investors in Hong Kong. Id. at ¶ 65. Second, Redo would use the proceeds from the sale of his interest in compressed natural gas traveling in a tanker ship, which would land in Manila in the Philippine Islands in late December. Id. at ¶ 67. Third, Redo was forming a new company with Chinese investors looking for green energy opportunities. Id. at ¶ 68.

January turned into February. There was no closing. Redo said he did not have the money he owed OmniWind. Id. at ¶ 69. On January 29, 2014, Redo said the tanker carrying the compressed gas was diverted from Manila to Hamburg, Germany because of a late December typhoon. The Chinese bankers' loans were taking a long time because his Hong Kong contact had not completed the necessary steps to finish the loan, but he would be able to close with OmniWind in a few weeks. Id. at ¶ 70. "To date, Redo has not informed OmniWind of the proceeds of the purported natural gas tanker, and the other pathways to closing continued to be dead ends." Id. at ¶ 71.

During the January 29, 2014 conversation, Douglass searched Redo Industries' corporate history and learned that it had lost its corporate existence. Id. at ¶ 72. Douglass confronted Redo who said he would reinstate the corporation and that Redo Industries and OmniWind still had a deal. Id. at ¶ 73. Redo did reinstate Redo Industries' corporate existence with the Kansas Department of State. Id. at ¶ 74.

Redo and Douglass executed a Reaffirmation of Standing Agreements on March 10, 2014, attached by plaintiffs as Exhibit L. Id. at ¶ 75. The Reaffirmation reinstated the obligations in the Binding Summary, Subscription, and Disclosure and emphasized "that there was a binding agreement between [Redo Industries] and OmniWind." Id.

OmniWind, its management, and some of its members, "including Schultz, [Clauss] and Douglass, were under increasing pressure to repay personal and business creditors related to OmniWind. Therefore, Douglass requested that Redo provide him with a letter, which was to be provided to creditors, indicating a date certain when closing would occur." Id. at ¶ 76.

On March 8, 2014, Redo sent a third letter indicating they would close no later than April 18, 2014. Id. at ¶ 77 (attached as Exhibit M). In reliance on that letter, OmniWind provided Redo and Redo Industries with documents to facilitate a closing, including a revised Operating Agreement, proposed employment contracts, and financing documents. Id. at ¶ 78. As the closing date approached, Redo once again began to signal that they might not close. Id. at ¶ 79. On April 17, 2014, Redo organized a conference call with investment bankers, in which Douglass participated. Id. at ¶ 80. Redo told the investment bankers that he would pledge OmniWind's assets -- including its technology, patents, joint ventures, and contracts as collateral for a corporate bond. Id. Redo Industries would control the proceeds from the bond, and would use the excess proceeds to fund its oil, gas, and commodity speculation, and any of OmniWind's future

needs. Id. at ¶¶ 80-81. "OmniWind believed this proposal to be far outside the scope of the transactions contemplated by" the Binding Summary and other documents. Id. at ¶ 82.

Douglass confronted Redo about his efforts since executing the reassurance letter, and Redo could not state any affirmative steps he had taken other than speaking with investment bankers about a nascent bond offering. Id. at ¶ 83. In May and June of 2014, Redo continued to request OmniWind's cooperation in issuing a bond to obtain funds that Redo could invest in OmniWind. On June 26, 2014, through counsel, OmniWind, Schultz, and Clauss demanded full repayment of the loans made to Redo, with accrued interest. Id. at ¶ 85. Redo has not paid them.

Plaintiffs assert seven causes of action against defendants Redo and Redo Industries.


## IV.    DISCUSSION

We first consider whether we have personal jurisdiction over defendants because a default judgment entered without personal jurisdiction is void.[3] Since we determine that we do have personal jurisdiction over both defendants as to all of plaintiffs' claims, we then consider whether to exercise our discretion to enter default judgment.


### A.    <u>Whether We Have Personal Jurisdiction Over Defendants</u>

A default judgment entered without personal jurisdiction is void, and so we must first consider whether we have personal jurisdiction over the defendants. D'Onofrio v. Il Mattino, 430 F. Supp. 2d 431, 437 (E.D. Pa. 2006). Although plaintiffs retain the burden of proving personal jurisdiction in a motion for default judgment, they may satisfy their burden with a prima facie showing. Id. at 438.

---

[3] Both Redo and Redo Industries returned waivers of service, so plaintiffs need not provide proof of service. See Fed. R. Civ. P. 4(d)(4).

A district court sitting in diversity exercises personal jurisdiction according to the law of the state where it sits. Fed. R. Civ. P. 4(k)(1)(A); O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007). Pennsylvania's long-arm statute permits the exercise of personal jurisdiction to the fullest extent allowed under the United States Constitution. 42 Pa. Cons. Stat. § 5322(b); Pennzoil Prod. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 200 (3d Cir. 1998) (personal jurisdiction over non-resident defendants authorized to the constitutional limits of the Fourteenth Amendment's Due Process Clause). We therefore inquire whether exercising personal jurisdiction over a defendant is constitutional. Id. Due Process requires a non-resident defendant to have certain minimum contacts with the forum state such that bringing the defendant into court does not offend traditional notions of fair play and substantial justice. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413 (1984) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

First, we must determine whether a defendant's contacts with the forum state are sufficient to support general jurisdiction. Pennzoil Products Co., 149 F.3d at 200. A party subject to general jurisdiction can be brought into court regardless of whether the subject matter of the cause of action has any connection to the forum state. Mellon Bank (East) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992). A party is subject to general jurisdiction when it has continuous and systematic contacts with the forum state. Provident Nat. Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987) (demonstrating minimum contacts is insufficient to establish general jurisdiction as plaintiff must show that a non-resident defendant's contacts are continuous and substantial).

Should we lack general jurisdiction, we must next inquire as to whether we have specific jurisdiction. Specific jurisdiction exists when a plaintiff's claim is related to, or arises out of, a

defendant's contacts with the forum state. Dollar Sav. Bank v. First Sec. Bank of Utah, N.A., 746 F.2d 208, 212 (3d Cir. 1984). The relationship among the defendant, the forum state, and the litigation creates the foundation for specific jurisdiction. Id. We ask whether a defendant has purposely availed itself of the forum state, invoking the benefits and protections of its laws, and whether a defendant's conduct and connection with the forum state are such that it should reasonably anticipate being brought into court there. Farino, 960 F.2d at 1222. A single contact creating a substantial connection with the forum state suffices to support exercising personal jurisdiction over a defendant. Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004). We analyze personal jurisdiction questions on a defendant-specific and claim-specific basis. Id. at 96 n. 1.

To determine whether there is specific jurisdiction, we must ask three related questions. First, has a defendant purposefully directed activities at the forum state? D'Jamoos ex rel. Estate of Weinegroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009). Second, does the litigation arise out of, or relate to, at least one of those activities? Id. And third, if the first two requirements have been met, does exercising jurisdiction comport with fair play and substantial justice? Id.

If there are sufficient minimum contacts to support personal jurisdiction, we must inquire whether exercising that jurisdiction comports with fair play and substantial justice. Farino, 960 F.2d at 1222. We must evaluate fairness based on several factors, including the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in

furthering fundamental substantive social policies. Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985)).

Because we analyze personal jurisdiction questions on a defendant-specific and claim-specific basis, we must separately consider Counts I-III and VI, which sound in contract; Count IV for unjust enrichment, a quasi-contractual basis of recovery sounding in equity; Count V for common law fraud and fraud per se, which sounds in tort; and Count VII, which asks us to pierce the corporate veil as to Redo Industries.

### 1.    Counts I-III And VI: Contract Claims

Though a contract may provide the basis for the proper exercise of personal jurisdiction, a contract alone does not automatically establish sufficient minimum contacts in the other party's home forum. Grant Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993) (quoting Burger King, 471 U.S. at 478).  We may consider contract negotiations, as well as a defendant's communications with those in the forum state via mail and telephone, all of which may count toward the minimum contacts needed to support in personam jurisdiction. Id.

Our Court of Appeals instructs us that

> In contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach. Parties who reach out beyond their state and create continuing relationships and obligations with citizens of another state are subject to the regulations of their activity in that undertaking. Courts are not reluctant to find personal jurisdiction in such instances. Modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.

General Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001) (internal quotations, citations, and brackets omitted).

Where the parties in a business transaction have conducted long-term relationships over electronic facilities, actual territorial presence is less determinative of whether there is personal jurisdiction.  The important consideration is "the intention to establish a common venture extending over a substantial period of time," not which party initiated the relationship. Id. at 151. We are obliged to consider "the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing" as we determine whether we have in personam jurisdiction.  Remick v. Manfredy, 238 F.3d 248, 256 (3d Cir. 2001).

Based on Redo and Redo Industries' course of dealing with OmniWind, we conclude we have specific jurisdiction over the defendants. Redo engaged in an extended course of dealing with OmniWind, including the initial Binding Summary and subsequent loans. This is the type of long-term business relationship conducted over electronic facilities which diminishes the determinative value of territorial presence in our jurisdictional analysis. Redo's course of dealing extended over months, if not years, with OmniWind, a Pennsylvania corporation. The initial Binding Summary contemplated that Redo Industries would purchase fifty percent of the fully diluted voting membership interests in OmniWind in exchange for $15 million of equity investment and $10 million in debt financing. Compl. Ex. A at 1. Plaintiffs' suit arises out of this failed business venture and loans made in contemplation thereof. We therefore find that Redo and Redo Industries purposefully directed activity at Pennsylvania, the forum state, and that this litigation arises out of that activity.

We must also decide whether exercising personal jurisdiction comports with fair play and substantial justice, considering the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the

interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.

Exercising personal jurisdiction here comports with traditional notions of fair play and substantial justice. Redo and Redo Industries have had a course of dealing with OmniWind, a Pennsylvania corporation, such that the burden of defending here is not oppressive. Pennsylvania, as the forum state, has an interest in adjudicating this dispute in which a Pennsylvania corporation and Pennsylvania residents allege a non-resident person and corporation have reneged on contracts and engaged in fraud. Plaintiffs have an interest in obtaining convenient and effective relief as, according to their complaint, they have been defrauded by defendants and are owed substantial funds.

We therefore find we have personal jurisdiction over both defendants for plaintiffs' contract claims.

### 2.      Count IV: Unjust Enrichment

In Comerota v. Vickers, 170 F. Supp. 2d 484 (M.D. Pa. 2001), the district court considered whether it had personal jurisdiction over defendants after they filed a Rule 12(b)(2) motion to dismiss plaintiff's claims for unjust enrichment. The district court considered the entire course of the parties' business relationships, including where they began, centered, and evolved. Id. at 490. As directed by our Court of Appeals, the court used a highly realistic approach to personal jurisdiction. See Farino, 960 F.2d at 1224. The district court appeared to evaluate personal jurisdiction under a quasi-contractual, not tort, framework.

Using that same highly realistic approach, we find that we also have personal jurisdiction over defendants as to plaintiffs' unjust enrichment claim. The same extended course of conduct supporting our finding of jurisdiction over plaintiffs' contractual claims -- including Redo and

16

Redo Industries' solicitation of multiple wire transfers from plaintiffs, allegedly in furtherance of Redo and Redo Industries' attempts to close the equity deal with OmniWind -- also supports finding personal jurisdiction over their unjust enrichment claim. As described in Part IV.A.1, exercising personal jurisdiction comports with fair play and substantial justice.

### 3.    Count VI: Common Law Fraud And Fraud *Per Se*

For intentional torts,[4] we use an effects test to determine whether there is personal jurisdiction. A plaintiff must show: (1) defendant committed an intentional tort, (2) plaintiff felt the brunt of the harm in the forum state such that the forum state can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort, and (3) defendant expressly aimed his tortious conduct at the forum state such that the forum state can be said to be the focal point of the tortious activity. IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 265-66 (3d Cir. 1998) (summarizing the effects test from Calder v. Jones, 465 U.S. 783 (1984), as it applies in the Third Circuit). To show the third prong of the test, plaintiff must demonstrate that defendant knew plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum state and point to specific activity indicating that defendant expressly aimed his tortious conduct at that state. Id. at 266.

Plaintiffs have made a prima facie showing that we have personal jurisdiction over defendants for this common law fraud claim. Plaintiffs' allegations include that Redo defrauded them by making material misrepresentations; that as a result of their reasonable reliance on those misrepresentations OmniWind has fallen into financial distress and Clauss and Schultz remain

---

[4] In Pennsylvania, the elements of common law fraud are: (1) misrepresentation of a material fact, (2) scienter, (3) intention by the declarant to induce action, (4) justifiable reliance upon the misrepresentation by the party defrauded, and (5) damage to the party defrauded as a proximate result. Hunt v. U.S. Tobacco Co., 538 F.3d 217, 225 n. 13 (3d Cir. 2008) (quoting Colaizzi v. Beck, 895 A.2d 36, 39 (Pa. Super. Ct. 2006)).

unpaid; and that Redo specifically misrepresented material facts to OmniWind and its

management team in order to obtain loans. Plaintiffs have felt the brunt of the harm from Redo's

alleged tortious conduct in the forum state, and Redo reaching out to plaintiffs in Pennsylvania

renders Pennsylvania the focal point of the tortious activity. As described in Part IV.A.1,

exercising personal jurisdiction comports with fair play and substantial justice.

We therefore find we have personal jurisdiction over the defendants for this claim.

### 4.    Count VII: Piercing The Corporate Veil

Jurisdiction over an individual cannot be based solely on jurisdiction over his or her

corporation. Government of Virgin Islands, Bureau of Internal Revenue v. Lansdale, 172 F.

Supp. 2d 636, 645 (D.C.V.I. 2001) (citing 4A Wright & Miller, Federal Practice & Procedure §

1069, at 370-72 (1987)). "However, if the corporation is not a viable one and the individuals are

in fact conducting personal activities and using the corporate form as a shield, a court may pierce

the corporate veil and permit assertion of personal jurisdiction over the individuals." Id. (citing

4A Wright & Miller, Federal Practice & Procedure, § 1069, at 372-74).

Plaintiffs have made a prima facie showing that we have personal jurisdiction over Redo

for their claim that we should pierce the corporate veil. Plaintiffs have pled that Redo allowed

Redo Industries' corporate existence to lapse; that Redo undercapitalized Redo Industries; and

that Redo used Redo Industries as a façade for his own operations.[5] These factual allegations and

---

[5] For example, the Subscription Agreement, attached as Exhibit B, includes the provision that the "undersigned hereby irrevocably subscribes for the following Units," and describes them. Compl. Ex. B at 1. The undersigned is Roderick O. Redo, President of Redo Industries, Inc. Id. at 5. In the portion of the Subscription where the undersigned was to identify what type of accredited investor it was, Redo checked "the undersigned is a natural person whose individual net worth (or joint net worth with the undersigned's spouse) exceeds $1,000,000 at the time of purchase." Id. at 2. There were options for indicating that the undersigned was "a

the supporting documentation from the exhibits to the complaint demonstrate, prima facie,

personal jurisdiction over Redo himself for this claim. As described in Part IV.A.1, exercising

personal jurisdiction comports with fair play and substantial justice.

We therefore find we have personal jurisdiction over both defendants for this claim. As

we have now determined that we have personal jurisdiction over both defendants for all of

plaintiffs' claims, we next consider whether we should enter default judgment.

### B.       Whether We Should Exercise Our Discretion To Enter Default Judgment

Plaintiffs are not entitled to an entry of default judgment as of right. A defendant's failure

to appear or answer does not vitiate our responsibility to examine the complaint, and we have

discretion to grant or deny entry of default judgment. In exercising our discretion, we are guided

by the Chamberlain factors noted above.

Although plaintiffs will be prejudiced by denying the entry of default judgment,

defendant may have meritorious defenses to many of plaintiffs' claims. Further, we may not infer

culpable conduct merely from Redo and Redo Industries' failure to answer or otherwise respond.

We will therefore deny plaintiffs' motion for entry of default judgment, as explained below.

### 1.       Count I: OmniWind Versus Redo And Redo Industries

In Count I, OmniWind brings a contract claim seeking the repayment with interest of the

Note attached as Exhibit F. Compl. at ¶¶ 87-92. Plaintiffs seek to recover the $100,000 in

principal, plus interest, which has been accruing at $49.32 per day and was $32,107.32 as of

October 31, 2014. Id. at ¶¶ 90-91.

---

corporation, business trust, trust or partnership, not formed for the specific purpose of purchasing
the Units, with total assets in excess of $5,000,000." Id. Redo did not check that box.

Exhibit F is a January 18, 2013 demand note for $100,000. Compl. Ex. F at 1. The Note provides that Redo Industries and Roderick O. Redo are "jointly and severally" the borrowers, though no corporation or person is identified in the space allocated for designating the lender. Id. at 1. The Note has no maturity date. Id. Roderick Redo signed the Note, and a Kansas notary public witnessed it. Id. at 5. The Note includes a waiver in which the "maker hereby irrevocably agrees that any legal action or proceeding arising out of this note may be brought in the federal and state courts of Pennsylvania located in Montgomery County and hereby expressly submits to the personal jurisdiction and venue of such courts…and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum." Id. at 3. However, the Note further provides that the Note "shall be enforced under the laws of the Commonwealth of Pennsylvania and any action shall be adjudicated in the Court of Common Pleas of Bucks County, Pennsylvania, without regard to conflict of laws rules." Id. at 4 (emphasis added).

Applying the Chamberlain factors, as to the first OmniWind may be prejudiced if we deny default as OmniWind avers that this demand note demonstrates that Redo and Redo Industries owe it substantial funds, with interest. This factor therefore weighs in favor of entering default judgment.

As to the second factor, defendants Redo and Redo Industries may have several meritorious defenses to OmniWind's claims that it is owed $100,000 plus interest on the basis of this demand note. First, while OmniWind avers that it issued the demand note as the lender to Redo and Redo Industries, OmniWind appears nowhere on the document, and only Redo signed it. It is not clear from the face of the Note that the obligation is to OmniWind. Second, the Note includes no maturity date. Compl. Ex. F at 1. Third, the Note includes apparently inconsistent terms regarding where adjudication is proper. Id. at 4. Defendants may have meritorious

arguments regarding the proper holder of this Note, whether the Note has matured, and the appropriate forum in which to adjudicate this action based upon the Note.[6] The second factor therefore weighs against entering a default judgment.

As to the third factor, it is unclear on this record whether defendants' default is due to culpable conduct or mere negligence. Culpable conduct is "conduct that is 'taken willfully or in bad faith.'" Chamberlain, 210 F.3d at 164. A "party's culpable conduct can 'not be inferred from the default but must appear independently' from the default." Eastern Elec. Corp., 657 F. Supp. 2d at 551. We cannot infer defendants' alleged culpable conduct merely from the default, and, absent independent evidence indicating culpability, this factor weighs against a default judgment.

Because two of the three factors weigh against entering default judgment, and defendants may have several meritorious defenses as to this claim, we will exercise our discretion and deny OmniWind's motion for entry of default judgment on this claim.

---

[6] Although defendants' default functions as an admission of all well-pleaded facts contained in the complaint, we must still ascertain whether the unchallenged facts constitute a legitimate cause of action. Chanel, Inc., 558 F. Supp. 2d at 536. See also, e.g., Trans World Airlines, Inc. v. Hughes, 308 F. Supp. 679, 683 (S.D.N.Y. 1969), aff'd as modified, 449 F.2d 51 (2d Cir. 1971). In Trans World Airlines, Inc., the district court explained that although defendants had forfeited the opportunity to offer evidence to controvert plaintiff's well-pleaded allegations in the complaint, they were permitted to show an allegation was not well-pleaded, albeit "only in very narrow, exceptional circumstances." Id.

Allegations would not be well-pleaded if "made indefinite or erroneous by other allegations in the same complaint," "contrary to facts of which the court will take judicial notice," "not susceptible of proof by legitimate evidence," or "contrary to uncontroverted material in the file of the case." Id. Notwithstanding OmniWind's allegations that this note memorializes a loan owed to it, the Note itself does not establish that OmniWind is the lender, nor do their pleadings indicate when the Note matured. This is the kind of indefiniteness that renders an unchallenged factual allegation less than well-pleaded.

2.      **Count II: Clauss Versus Redo And Redo Industries**

In Count II, Clauss brings a contract claim against Redo and Redo Industries seeking repayment of the $8,000 Note, plus late fees and interest. Compl. at ¶¶ 92-97. Clauss claims interest has been accruing at $3.95 per day and, as of October 31, 2014 has accrued to $1,832.80. Id. at ¶¶ 95-96.

Exhibit J is a July 10, 2013 demand note in the amount of $8,000. Compl. Ex. J at 1 (the "Clauss Note"). The Clauss Note indicates that Redo and Redo Industries are jointly and severally the borrowers, while Clauss is the lender. Id. at 1. The Clauss Note includes a promise to pay the principal sum of $8,000, plus interest and fees and costs. Id. The Note matured on July 24, 2013. Id. The Clauss Note includes, among other provisions, a Confession, a Waiver, and a provision for Jurisdiction and Venue. The Confession and Waiver appear in all upper case letters, in a larger font, and are similarly offset from the rest of the Note. Id. at 3-4. In the Confession,[7]

---

[7] The Confession provides:

> Maker hereby empowers any attorney of any court of record, after the occurrence of any event of default hereunder, to appear for maker and, with or without complaint filed, confess judgment, or a series of judgments, against maker in favor of payee or any holder hereof for the entire principal balance of this note, all accrued interest and all other amounts due hereunder, together with costs of suit and reasonable attorneys' fees, and for doing so, this note or a copy verified by affidavit shall be a sufficient warrant. Maker warrants that this is a commercial transaction[.]

> Maker hereby forever waves and releases all errors in such proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. Interest on any such judgment shall accrue at the default rate. No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but he power shall continue undiminished and it may be exercised from time to time as often as the payee shall elect until such time as the payee shall have received payment in full of the debt, interest and costs.

Redo agrees that Clauss may confess judgment against Redo in the event of default. Id. at 3. In the Waiver, Redo

> hereby irrevocably agrees that any legal action or proceeding arising out of this note may be brought in the federal and state courts of Pennsylvania located in Bucks County and hereby expressly submits to the personal jurisdiction and venue of such courts…and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum.

Id. at 4. In the Jurisdiction and Venue provision, the Note says that it "shall be enforced under the laws of the Commonwealth of Pennsylvania, and any action shall be adjudicated in the Court of Common Pleas of Bucks County, Pennsylvania, without regard to conflict of laws rules." Id.

Again, our Court of Appeals requires us to consider the three Chamberlain factors before entering a default judgment.   As to the first factor, Clauss will be prejudiced if we deny default as he holds a matured Note for $8,000 owed to him, with substantial interest, by defendants.

As to the second factor, whether defendants have a meritorious defense, defendants may have a defense related to venue: the Note appears to provide for exclusive venue in the Court of Common Pleas of Bucks County, Pennsylvania. We use federal law when determining the effect of forum state selection clauses because questions of venue and such clauses are essentially procedural, not substantive, in nature. Jumara v. State Farm Ins. Co., 55 F.3d 873, 877 (3d Cir. 1995) (explaining that the effect given a contractual forum selection clause in diversity cases is determined by federal law, not state law).

28 U.S.C. § 1391(b)(2) provides that a civil action may be brought in a judicial district where a substantial part of the events or omissions giving rise to the claim occurred. Venue is therefore proper in the Eastern District of Pennsylvania because a substantial part of the events

---

Compl. Ex. J at 3 (emphasis omitted).

giving rise to Clauss's claim occurred here. Because venue is proper here, we consider the effect of the forum selection clause pursuant to 28 U.S.C. § 1404(a). See Jumara, 55 F.3d at 879.[8]

Plaintiff's choice of venue should not be lightly disturbed. Id. In addition to the three factors enumerated in Section 1404(a) -- party convenience, witness convenience, and the interests of justice -- courts may consider a wide variety of public and private interests, including forum selection clauses, which are "treated as a manifestation of the parties' preferences as to a convenient forum." Jumara, 55 F.3d at 880. Such selection does not receive dispositive weight, though it is entitled to substantial consideration. Id. Although courts normally defer to a plaintiff's choice of forum, deference is inappropriate where the plaintiff has already contractually chosen an appropriate venue. Id. Where the forum selection clause is valid and there has been no fraud, influence, or unconscionable bargaining power to obtain it, plaintiffs bear the burden of demonstrating why they should not be bound by their contractual decision. Id.

A district court's construction of a contract -- including a forum selection clause -- concerns the legal effect of an agreement and is therefore a question of law. Id. at 881. "[B]efore

_____

[8] 28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." By contrast, 28 U.S.C. § 1406(a) provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

Though we are not transferring this case to another district or division, Jumara teaches that Section 1406(a) is not the correct section to invoke when venue is actually proper:

> Although the district court in effect disposed of the case under 28 U.S.C. § 1406 (for improper venue), we conclude that, because venue was actually proper in the Eastern District of Pennsylvania, the case could not be dismissed pursuant to that provision. The district court should instead have invoked 28 U.S.C. § 1404(a), which involves a multi-factor balancing test in which a contractual forum selection clause carries substantial although not dispositive weight.

Jumara, 55 F.3d at 875.

a contractual forum selection provision can be enforced, it must actually effectuate a selection."
<u>Wall Street Aubrey Golf, LLC v. Aubrey</u>, 189 F. App'x 82, 85 (3d Cir. 2006). A court cannot
modify the plain meaning of a contract's words under the guise of construction or interpretation.
<u>Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.</u>, 619 F.2d 1001, 1010 (3d Cir. 1980). However, we
should avoid ambiguities when permitted by the plain language of the contract itself. <u>First State
Underwriters Agency of New England Reinsurance Corp. v. Travelers Ins. Co.</u>, 803 F.2d 1308,
1311 (3d Cir. 1986). Contract language is ambiguous when it has more than one reasonable
construction. <u>Mellon Bank</u>, 619 F.2d at 1011.

Without torturing the contract language, we can avoid ambiguity in the Clauss Note and
find that the Note provides for laying venue in this civil action in the Court of Common Pleas of
Bucks County, Pennsylvania, while providing for a broader range of venues in the event the Note
holder, Clauss, chooses to enter a Confession of Judgment against the defendants. Reading the
contract to lay venue in this civil action in federal court requires ignoring an explicit,
unambiguous portion of the Note, while reading the contract to provide venue in the Court of
Common Pleas of Bucks County does not. It is much less tortured, and truer to the plain
language of the contract, to read the provision for Waiver as applicable only to the provision for
Confession -- a unique procedural device that Pennsylvania law permits.

Pennsylvania law recognizes and permits entry of a confessed judgment pursuant to
warrants of attorney contained in a written agreement. <u>Midwest Fin. Acceptance Corp. v. Lopez</u>,
78 A.3d 614, 623 (Pa. Super. Ct. 2013) (citing <u>Scott Factors, Inc. v. Hartley</u>, 228 A.2d 887 (Pa.
1967)). Parties are free to determine how the warrant may be exercised, but entry of a valid
judgment by confession must be "made in rigid adherence to the provisions of the warrant of
attorney; otherwise, such judgment will be stricken." <u>Id.</u> (quoting <u>Dollar Bank, Fed. Sav. Bank v.</u>

Northwood Cheese Co., Inc., 637 A.2d 309, 311-12 (Pa. Super Ct. 1994), appeal denied, 653 A.2d 1231 (Pa. 1994)). Such warrants must be explicit and will be strictly construed, with ambiguities resolved against the party in whose favor the warrant is given. Id.

Reading the Confession and Waiver provisions together, defendants agreed to permit Clauss to enter a confession of judgment in the event of default. This warrant is explicit, and includes a provision that the venue for entering a confession of judgment may be in in federal or state court in Bucks County.

The Pennsylvania Superior Court has held that "unless otherwise specified in the agreement, the general venue terms of Rule 1006 do not automatically apply to the initial filing of a judgment of confession, and cannot be used to strike an otherwise lawful confession of judgment that has been entered in strict compliance with a valid warrant of attorney." Midwest Fin. Acceptance Corp., 78 A.3d at 618. This suggests that the Pennsylvania venue provisions for confessions of judgment are indeed different from the provisions for civil actions, and general venue rules do not apply to such confessions. Id. at 622, 626 (explaining that a confession of judgment for money pursuant to an instrument is not governed by the same rules of notice and adversarial protections as ordinary civil complaints). We thus read the Waiver provision -- in which the defendants waived venue objections -- as modifying the Confession provision to provide Clauss with a wider range of venue choices in which to enter a confession of judgment than he would have for filing other civil actions.  Our reading the Waiver and Confession together is supported by the appearance of the Note, which includes both provisions in a larger font size offset from the rest of the Note in all upper case letters, as opposed to the other provisions of the Note written in the usual mix of upper and lower case.

This reading of the Waiver and Confession together in light of <u>Midwest Fin. Acceptance Corp.</u> resolves the ambiguity that arises when reading those provisions in conjunction with the Jurisdiction and Venue provision: the Note expresses that the defendants have waived venue objections as to entries of confession of judgment, and that venue is permitted in that instance in either federal or state court in Bucks County, while venue for other actions upon the Note is proper only in the Court of Common Pleas in Bucks County, Pennsylvania.

In order to read the Clauss Note as manifesting the parties' intent to lay venue in federal court, we would have to read out of the Note itself the explicit provision for Jurisdiction and Venue. To do so would be to modify the plain meaning of the contract's words under the guise of construction and interpretation. However, by reading the Confession and Waiver provisions together as providing a different set of bargained-for venue expectations from those contemplated in the rest of the Clauss Note, we avoid ambiguity and having to torture the language of the Note to say something it does not.

Having determined that the contract provides for laying venue in this action in the Court of Common Pleas of Bucks County, we give that forum selection clause substantial, but not dispositive, weight.  Considering the convenience to parties and witnesses, as well as the interests of justice, we will give effect to the Jurisdiction and Venue provision. OmniWind's principal place of business is in Bucks County, Pennsylvania and litigating there would not be inconvenient for the parties. Doylestown, where Clauss resides, is also the county seat of Bucks County.

As the witnesses to this action -- excluding absent defendants -- are OmniWind, Clauss himself, and other OmniWind employees and managers, it is not inconvenient for them to litigate in Bucks County. The interests of justice further weigh in favor of honoring the venue provision

in the Clauss Note. There is no allegation that the venue selection was obtained through fraud or duress, and Clauss, as holder of the Note, has been on notice since its execution that the Note expressly provided for venue in the Court of Common Pleas in Bucks County, Pennsylvania.

Having concluded that the second Chamberlain factor weighs against entering default, we next consider the third factor -- defendants' culpable conduct. As previously explained, we cannot infer culpable conduct merely from defendants' failure to answer.

Two of the Chamberlain factors weigh against entering default judgment, and entering default judgment is left to the Court's discretion. We will therefore deny Clauss's motion for entry of default judgment on this claim.

### 3.   Count III: Schultz Versus Redo And Redo Industries

In Count III, Schultz asserts a contract claim against Redo and Redo Industries seeking repayment, with interest, of a $17,000 Note, attached as Exhibit K. Compl. at ¶¶ 99-104. Schultz claims interest has been accruing at $8.38 per day and, as of October 31, 2014, was $3,888.32. Id. at ¶¶ 102-03.

Exhibit K is a July 10, 2013 demand note for $17,000. Compl. Ex. K at 1 (the "Schultz Note"). The Schultz Note provided that Redo Industries and Redo are jointly and severally borrowed the funds from Schultz. Id. The promise to pay included the principal sum, plus interest and fees and costs, and the Note matured on July 24, 2013. Id. Like the Clauss Note, the Schultz Note includes the same provisions for Confession, Waiver, and Jurisdiction and Venue. Id. at 4-5. The Confession and Waiver appear exactly as they do in the Clauss Note -- offset from the rest of the Note, in all upper case letters, and in a larger font. Id. The Waiver contains a waiver of improper venue and lays venue in either federal or state court in Bucks County, while

the provision for Jurisdiction and Venue provides for adjudication in the Court of Common Pleas of Bucks County. Id. at 4. Redo signed the Note on behalf of Redo Industries. Id. at 5.

Applying the Chamberlain factors, our analysis of the Schultz Note is no different from our consideration of the Clauss Note. Schultz will be prejudiced if we deny default as he is owed substantial sums under the Note. Defendant may have meritorious defenses based on the contractually provided-for venue, notwithstanding the waiver of improper venue should Schultz choose to enter a confession of judgment against Redo. Like Clauss, Schultz also resides in Bucks County, and it is not inconvenient to the parties or witnesses, nor unjust, to honor the parties' agreement to lay venue in the Court of Common Pleas there. We cannot infer culpable conduct merely from defendants' failure to answer.

Two of the three Chamberlain factors weigh against entering default judgment, and entering default judgment is left to our discretion. We will therefore deny Schultz's motion for entry of default judgment on this claim.

### 4.    Count IV: All Plaintiffs Versus Redo And Redo Industries

In Count IV, OmniWind, Clauss, and Schultz assert a claim for unjust enrichment against Redo and Redo Industries. Compl. at ¶¶ 106-11. Plaintiffs allege that they collectively transferred $155,000 to Redo and Redo Industries in order to effectuate closing. Id. at ¶¶ 106-07. Plaintiffs also aver that they relied upon the express verbal and written statements made by Redo that he could close, and that defendants have received and appreciated the benefits of that $155,000. Id. at ¶¶ 108-09.

To recover under the equitable doctrine of unjust enrichment, a plaintiff must demonstrate: (1) plaintiff conferred benefits on defendant; (2) the appreciation of such benefits by defendant; and (3) the acceptance and retention of such benefits under such circumstances

29

that it would be inequitable for defendant to retain the benefit without payment of value. Stout Street Funding LLC v. Johnson, 873 F. Supp. 2d 632, 645 (E.D. Pa. 2012) (citing Mitchell v. Moore, 729 A.2d 1200, 1203-04 (Pa. Super. Ct. 1999)). A plaintiff must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the providers. Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 625 (E.D. Pa. 2010) (citations omitted). Determining whether unjust enrichment applies is a fact-specific inquiry and the court focuses on whether a defendant has been unjustly enriched, not the parties' intent. Styer v. Hugo, 619 A.2d 347, 350 (Pa. Super. Ct. 1993); see also Stoeckinger v. Presidential Fin. Corp. of Del. Valley, 948 A.2d 828, 833 (Pa Super. Ct. 2008).

But we cannot find unjust enrichment where a written or express contract exists between the parties. Mitchell, 729 A.2d at 1203. The doctrine of unjust enrichment does not apply when the "relationship between the parties is founded upon written agreements." Brown & Brown, 745 F. Supp. 2d at 625 (citing Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006)). However, early in the pleadings, plaintiffs may plead in the alternative, though a later finding of a valid contract precludes recovery under a quasi-contractual theory. Id. at 626.

As we apply the Chamberlain factors, the first -- prejudice to plaintiff -- weighs neither for nor against granting default judgment. There is no prejudice to a party whose claims are denied because they are meritless. See, e.g., Limehouse v. Delaware, 144 F. App'x 921, 923 (3d Cir. 2005). There may be no finding of unjust enrichment where a written or express contract exists between the parties. Mitchell, 729 A.2d at 1203. Plaintiffs, however, are entitled to plead in the alternative. Thus, the merits of this claim are inextricably tied up with the validity and scope of the Note for $100,000, as well as the Clauss and Schultz Notes.

We consider the second factor, whether defendants have a meritorious defense to this claim. Plaintiffs have pled, in the alternative, a theory of unjust enrichment to recover $155,000 from Redo and Redo Industries. Plaintiffs have demonstrated that, at least pursuant to Exhibits J and K, Clauss and Schultz loaned Redo and Redo Industries $25,000. However, Clauss and Schultz cannot recover those sums or interest under a theory of unjust enrichment because they have written contracts governing the repayment of those sums, and we cannot find unjust enrichment where such a contract exists between the parties.

Similarly, even though there are provisions of the Note in Exhibit E that weigh against the entry of default judgment on a contract theory, the existence of that document cautions against entering default judgment on an unjust enrichment theory. We cannot find unjust enrichment where there is a written or express contract between the parties, which Exhibit E may well be. The provisions of the Note that give us pause in entering default judgment on a contract theory are not so indicative of a lack of a written or express agreement that we may alternatively find for OmniWind on an unjust enrichment theory, which necessarily requires us to find that there was no written or express agreement at all.

Thus, the second factor weighs against granting default judgment. As discussed, the third factor weighs against granting default judgment as we cannot infer culpable conduct from defendants' failure to answer.

Two of the three Chamberlain factors weigh against entering default judgment, a matter for the Court's discretion. We will therefore deny plaintiffs' motion for entry of default judgment on this claim.

5.   <u>**Count V: All Plaintiffs Versus Redo And Redo Industries**</u>

In Count V all plaintiffs bring a claim of common law fraud and fraud <u>per se</u> against

Redo, alleging he has made "false representations, promises and created false pretenses" in order

to obtain money from them. Compl. at ¶¶ 113-14. Plaintiffs claim Redo knew or had reason to

believe that his statements were false and that the promises he made would not be fulfilled and

that those false statements, pretenses, and promises induced plaintiffs to make their respective

loans to Redo and/or Redo Industries. <u>Id.</u> at ¶¶ 115-16. Plaintiffs, claiming Redo's behavior was

extreme and outrageous, demand statutory, contractual, and punitive damages. <u>Id.</u> at ¶¶ 119-20.

In Pennsylvania, the elements of common law fraud are: (1) misrepresentation of a

material fact, (2) scienter, (3) intention by the declarant to induce action, (4) justifiable reliance

upon the misrepresentation by the party defrauded, and (5) damage to the party defrauded as a

proximate result. <u>Hunt</u>, 538 F.3d at 225 n. 13 (quoting <u>Colaizzi</u>, 895 A.2d at 39).

Fed. R. Civ. P. 9(b) requires a party alleging fraud or mistake to "state with particularity

the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions

of a person's mind may be alleged generally." <u>See also</u> <u>In re Westinghouse Secs. Litig.</u>, 90 F.3d

696, 717 (3d Cir. 1996) (explaining the heightened pleading standard of Rule 9(b) for fraud).

Plaintiffs must plead with sufficient particularity to put a defendant on notice of the precise

misconduct with which he is charged, and therefore must plead or allege the date, time, and place

of the alleged fraud, or "otherwise inject precision or some measure of substantiation into a fraud

allegation." <u>Frederico v. Home Depot</u>, 507 F.3d 188, 200 (3d Cir. 2007).

The Supreme Court of Pennsylvania has determined

> that a party who engages in intentional fraud should be made to
> answer to the party he defrauded, even if the latter was less than
> diligent in protecting himself in the conduct of his affairs…we
> have relied on the principle [from the Restatement of Torts] that

> the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but that he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious.

Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 207 (Pa. 2007). To be justifiable, reliance upon the representation of another must be reasonable. Porecco v. Porecco, 811 A.2d 566, 571 (Pa. 2002). The nature of the relationship between the parties may affect the reasonableness of one party's reliance. Id.

Plaintiffs plead with particularity the circumstances they aver constitute fraud. These include specific dates and times of conversations with Redo, how much money he requested in each conversation and what he represented he would be able to do upon receipt of those requested funds, the letters and papers Redo wrote or produced to assure OmniWind of his intentions to close and capacity to do so, and the damages plaintiffs have suffered as a result.

Redo's allegedly fraudulent misrepresentations occurred between October of 2012 and June of 2014 -- a period encompassing the entire course of conduct between plaintiffs and defendants. All of plaintiffs' claims arise from this course of conduct, and many of the claims are intertwined.

As noted, entry of default judgment is a discretionary matter for the Court under Chamberlain. See Chamberlain, 210 F.3d at 164.

Plaintiffs will be prejudiced if we do not enter default, as they will continue to be unable to seek redress from defendants for their alleged fraud. It is unclear what defenses, if any, defendants have for this claim. We cannot infer culpable conduct merely from defendants' failure to answer.

Two Chamberlain factors weigh in favor of entering default judgment and one weighs against. Entering default judgment is a matter for our discretion. The plaintiffs' common law fraud claim is part and parcel to their other claims, and all those claims arise from a common nucleus of operative fact. Entering default judgment on this claim alone is neither in the interests of judicial economy nor justice. We will therefore deny plaintiffs' motion for entry of default judgment on this claim.

### 6.     OmniWind Versus Redo Industries

In Count VI, OmniWind asserts a claim against Redo Industries for breach of contract. Compl. at ¶¶ 122-37. OmniWind alleges that it reasonably relied upon Redo Industries' ability to perform its obligations under the Binding Summary, Subscription, and Disclosure, as Redo represented that Redo Industries would be able to do so. Id. at ¶¶ 122-23. Redo, acting on Redo Industries' behalf, knew OmniWind was continuing to incur financial obligations while waiting for Redo and Redo Industries' performance under the respective documents. Id. at ¶ 124. Redo knew from the due diligence undertaken prior to signing the Binding Summary that OmniWind would be using some of Redo Industries' investment to pay past-due payables and perform under its contracts. Id. at ¶ 125. Because of Redo and Redo Industries' two years of delay, OmniWind lost and continues to lose business opportunities, including the services of its key engineering, administrative, financial and support personnel. Id. at ¶¶ 126-27. OmniWind claims the loss of business opportunities and accrual of business expenses are reasonably foreseeable consequences of Redo failing to perform. Id. at ¶ 128. OmniWind avers it has taken all reasonable steps to mitigate its damages, including furloughing employees, cancelling ongoing contractual obligations, pursuing alternative financing, and reducing office space. Id. at ¶ 129.

OmniWind also claims that when Redo signed the Binding Summary OmniWind was a party to a significant contract with a "major big box retailer with a [sic] international presence" that would allow OmniWind to install from five to twenty turbines -- at $10,000 per turbine -- at about five thousand locations in the United States. Id. at ¶¶ 130-31. "OmniWind estimates its profits from the Big Box PPA were to be approximately $50,000,000.00." Id. at ¶ 132. OmniWind claims Redo knew of its capital needs to fund this contract and that OmniWind was relying upon Redo's performance to meet its obligations. Id. at ¶ 134. As a result of Redo Industries' breach of its duties under the Binding Summary, Subscription, and Disclosure, OmniWind claims to have suffered lost profits in excess of fifty million dollars. Id. at ¶¶ 135-37.

The October 12, 2012 Binding Summary of Proposed Terms (Exhibit A) includes, in a box at the very top of the first page:

> **Note:** The terms and conditions presented below define the basis for the purpose of outlining those terms pursuant to which a definitive agreement will be entered into via a Private Placement Memorandum, "PPM". Closing of the final transaction is contingent upon final negotiation and execution of satisfactory documentation containing customary closing conditions, representations, warranties, etc. which will be contained in the PPM.

Compl. Ex. A at 1.

Karl Douglass, as President and CEO of OmniWind, and Roderick O. Redo, as President of Redo Industries, Inc., initialed every page of the Binding Summary, and their signatures appear at the end. Id. at 1-6. The Binding Summary also includes five "Closing Conditions," which are prefaced by:

> The Investor's obligation to consummate the transaction contemplated hereby is subject to, among other things, the following conditions which are to be performed by 5:00 PM of October 19, 2012. Due diligence documentation for these and other items, have been or will be provided to the Investor.

Id. at 3.

The Binding Summary also indicates that "[f]inal closing of this transaction is to be held within 8 business days after the signing of this Agreement." Id. at 6. In the "Definitive Agreements" section, the Binding Summary reads: "The transaction contemplated hereby is subject to the negotiation of definitive agreements, which shall include a purchase agreement and an amended and restated operating agreement of [OmniWind]." Id. at 3.

Applying the first Chamberlain factor weighs in favor of entering default judgment, as plaintiffs will continue to be without remedy for this alleged breach of contract.

But the second factor weighs against entering default judgment. Plaintiffs emphasize in their complaint that a closing never took place, and that, in fact, they all loaned Redo and Redo Industries substantial sums of money in order to facilitate that closing. Though plaintiffs refer repeatedly to the Binding Summary as the "Contract," on its face it appears to be an agreement to agree. On March 10, 2014, OmniWind and Redo executed a "Reaffirmation of Standing Agreements." Compl. Ex. L at 1. This Reaffirmation does not appear to change the status quo of the Binding Summary, but rather reaffirms the parties' existing obligations pursuant thereto. Id. at 1-2. Defendants Redo and Redo Industries may therefore have a meritorious defense.

As we have explained, the third factor weighs against entering default judgment, as we cannot infer culpable conduct merely from defendants' failure to answer.

Entering default judgment is discretionary. Default judgments are generally disfavored, and especially disfavored in cases involving large sums. Plaintiffs claim lost profits in excess of fifty million dollars. On the basis of the Chamberlain factors, as well as these other considerations, we will deny OmniWind's motion for default judgment on this breach of contract claim.

7.        **Count VII: All Plaintiffs Versus Redo**

In Count VII, all plaintiffs seek to pierce the corporate veil of Redo Industries. Compl. at ¶¶ 139-43. Plaintiffs allege Redo "substantially undercapitalized in relation to the obligations" of Redo Industries in the Binding Summary. Id. at ¶ 139. Plaintiffs claim Redo used the corporate form for a fraudulent purpose, in that he induced them to transfer money to Redo Industries based on false statements, representations, and pretenses. Id. at ¶ 140. They allege Redo has not conformed to corporate formalities and is not entitled to the individual protections afforded by the corporate form, and therefore any of Redo Industries' liabilities should be imputed to Redo in his personal capacity, jointly and severally with his company. Id. at ¶¶ 141-43.

A shareholder is generally not personally liable to perform corporate obligations. Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1520-21 (3d Cir. 1994). A court pierces the corporate veil only when the corporation is an artifice and a sham used to execute illegitimate purposes and an abuse of the corporate fiction and immunity that it carries. Id. at 1521. Courts may pierce the corporate veil to prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime. Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967). When deciding whether to pierce the corporate veil, courts are concerned whether equity requires that the shareholders' traditional insulation from personal liability should be disregarded and with ascertaining if the corporate form is a sham, constituting a façade for the operations of the dominant shareholder. Id. Courts may pierce the corporate veil when the corporation fails to observe corporate formalities or does not pay a dividend; the dominant shareholder siphons funds; the corporation is merely a façade for the dominant stockholder's operations; and sometimes when the corporation is undercapitalized. Id. (citing United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981)).

Considering the Chamberlain factors, plaintiffs will be prejudiced by failure to grant default judgment on this claim, as they will continue to be without redress. Defendants' meritorious defenses, if any, are unclear. We cannot infer culpable conduct from the mere fact of a defendant's failure to answer.

Although two of the three Chamberlain factors weigh in favor of entering default judgment, doing so is discretionary. This claim is intimately bound up with plaintiffs' other claims and it would hardly serve the interests of justice or judicial economy to grant default judgment on it alone. We will therefore deny plaintiffs' motion for entry of default judgment on this claim.

## V.      CONCLUSION

Although defendants have defaulted, our responsibilities are not vitiated by their failure to answer or respond, and plaintiffs have no entitlement as of right to an entry of default judgment on their claims. On the record before us, and considering the common nucleus of operative facts from which plaintiffs' claims arise, granting default judgment on some, but not all, of plaintiffs' claims, when the Chamberlain factors weigh in favor of denying most of them, is not in the interest of justice or judicial economy.

We will therefore deny plaintiffs' motion for entry of default judgment against Redo and Redo Industries on Counts I-VII. We will also dismiss plaintiffs' complaint without prejudice.

An appropriate Order follows.

BY THE COURT:

 _/s/ Stewart Dalzell, J.
Stewart Dalzell, J.